# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 1, 2013

## STATE OF TENNESSEE v. VICTOR THOMPSON

**Appeal from the Circuit Court for Gibson County**
**No. 18590     Clayburn Peeples, Judge**

---

**No. W2013-00226-CCA-R3-CD  - Filed February 14, 2014**

---

The Defendant, Victor Thompson, was convicted by a Gibson County Circuit Court jury of second degree murder, a Class A felony, and theft of property valued at $500 or less, a Class A misdemeanor.  *See* T.C.A. §§ 39-13-210(a)(1), 39-14-103 (2010).   The trial court sentenced the Defendant as a Range I, standard offender to consecutive terms of twenty-five years for second degree murder and eleven months, twenty-nine days for theft.  On appeal, the Defendant contends that the trial court erred during sentencing.  We conclude that the lengths of the sentences are proper but that the trial court erred by failing to state on the record the facts and conclusions which support consecutive sentences pursuant to *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).  We remand the case in order of the court to make its findings and conclusions on the record.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Tom W. Crider, Trenton, Tennessee, for the appellant, Victor Thompson.

Robert E. Cooper, Jr., Attorney General and Reporter; Desha Dulany Faughn, Assistant Attorney General; Garry Brown, District Attorney General; and Jason Scott and Hillary Lawler Parham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the stabbing death of Charlie Reagan.  The evidence shows that Carl Pickler was good friends with the victim, the owner of a local muffler shop.  They visited almost daily at the victim's shop, and Mr. Pickler routinely picked up automotive

parts for the victim. On June 16, 2011, Mr. Pickler stopped by the shop to determine if the victim needed parts. When he was there, a customer paid the victim $200, and the victim placed the cash in his shirt pocket. Mr. Pickler saw the Defendant ask the victim to use his telephone, and the victim told the Defendant where to find the telephone. The victim was known to keep watermelons and a large knife near the telephone the Defendant used. As Mr. Pickler began to leave the shop, he heard the victim yell, "No." Five or six minutes after Mr. Pickler left, he saw police cars traveling toward the shop. He learned minutes after seeing the police cars that the victim had been stabbed.

The victim was known to keep about $300 or $400 in his pants pocket. The victim always paid Mr. Pickler with cash from his pants pocket for automotive parts. The day of the killing, though, Mr. Pickler saw the victim place the $200 from the customer in his shirt pocket.

Mike Williams arrived at the victim's muffler shop for new tires around 2:40 p.m. He found the victim face down and attempted to wake him. The victim told Mr. Williams to call 9-1-1 and said, "I've been stabbed and I'm dying." The victim lifted his right hand into the air and shook it and went limp.

Laura Hardin, a registered nurse, treated the victim in the emergency room at Milan General Hospital. The victim did not have a heart beat or a pulse when he arrived, although CPR continued for sometime. She saw four stab wounds to the abdomen. Several medications were administered and medical procedures were unsuccessfully performed in an attempt to restart the victim's heart.

Milan Police Officer Chad Autry was told to be on the look out for the Defendant because Investigator Williams wanted to talk to him about the victim's stabbing. He went to the local Walmart after learning the Defendant was heading there in a red Pontiac with Shadarra Gadlen. He stopped the Pontiac, but the Defendant was not in the car. Ms. Gadlen claimed that she dropped off the Defendant at Walmart. He and Officers Finnessee and Cook found the Defendant at Walmart and arrested him. The Defendant met a Walmart employee and placed a bag of clothes on the employee's car. The bag contained bloody clothes, a telephone, a video camera, and shoes. The clothes were sent to the Tennessee Bureau of Investigation (TBI) crime laboratory for analysis. The Defendant did not have visible injuries, weapons, or money at the time of his arrest. Ms. Gadlen's Pontiac was later searched by Humbolt police.

Milan Police Investigator Jason Williams, the lead investigator assigned to this case, asked the victim who hurt him, but the victim was unable to talk. He identified photographs of a homemade mallet or hammer lying near the victim, which had blood on it, and a pool

of blood in the area where the victim was found. A bloody, large socket wrench and a pair of pliers were found at the scene. The hammer, socket wrench, and pliers were sent to the TBI crime laboratory for analysis. Blood spatter was found on the wall and boxes nearby, and swabs were taken to the TBI crime laboratory for analysis. Footprints leading from the back door of the victim's shop were also recovered. A customer's check was found on the desk inside the office, but no cash was found. The victim's family later found cash in the shop. The victim's clothes were sent to the TBI crime laboratory for analysis. Investigator Williams learned from an informant that the Defendant might have been involved in the victim's death.

The Defendant's recorded police interview was played for the jury. The Defendant stated that when he arrived at the shop an older man was there and that a woman also stopped by the shop. He was embarrassed and waited for them to leave but talked to the older man. He asked the victim for a job, but the victim refused. He asked the victim why he could not have a job because he had previously worked for the victim. He said that the victim called him a "n-----," that he told the victim he was not a "n-----," and that the victim picked up a sledge hammer and came toward his face. The Defendant said that he attempted to block the hammer but that it hit his face and "busted his lip." The Defendant grabbed a knife when the victim came toward him with the hammer. He claimed that the victim came at him several times, that the knife went into the victim, and that he did not "give it a force." They struggled, and the knife "slid across" the Defendant's hand because his hand was loose around the knife handle. The Defendant picked up the knife and ran. He provided the police directions to the knife's location. The knife matched a knife set owned by the victim.

The Defendant claimed to have mentioned the killing to his uncle Bug when he was at his uncle's mother's house in Milan on the day of the stabbing. His then-girlfriend was with him when he spoke to his uncle, but the Defendant denied telling her what occurred, although he told her he might have killed someone. When asked if he thought the victim was going to hurt him, he said, "No, I didn't think -- I don't know if he'd hurt . . . I really thought I was gonna use my fist, but then I saw the knife and I was like, he got a hammer." He denied taking anything from the victim.

The Defendant had $11 at the time of his arrest. The Defendant changed clothes before the interview and admitted the clothes he wore during the stabbing were inside the bag recovered by the police. Buccal swabs were obtained from the Defendant and sent to the TBI crime laboratory for analysis. Although the Defendant said the victim hit him with a hammer in the lobby of the muffler shop, no blood was found there. All the blood was found in the shop area. Investigator Williams did not see any wounds on the Defendant's head or lip, although the Defendant had a small cut to his finger.

Investigator Williams believed a robbery occurred because no money was found at the scene, although the victim's wallet, pocket calender, and some money were found by the victim's family. The victim's family found $599 cash at the victim's shop, which was provided to the police. The $200 cash given to the victim by the customer the day of the stabbing was not found. Although money was found inside the shop sometime after the killing, no money was found on the victim's person. It was this missing money that was the basis for the robbery charge.

Chad Ferrell, the victim's son-in-law, knew the victim always to have money in his pockets when he was at work. He recalled one occasion when the victim pulled $3000 from his pocket to help Mr. Ferrell purchase a truck. He said the victim carried money loose in his pants pocket. Mr. Ferrrell found the victim's wallet and calender wallet inside the shop in its usual place two days after the killing.

Sara Reagan, the victim's daughter, knew the victim to keep money in his right pocket. Larry Reagan, the victim's brother, knew the victim always carried money in either his pants or shirt pockets. The victim kept the money folded in his shirt and pants pockets and used it to make change for his customers.

Shadarra Gadlen and the Defendant were "trying to date" before his arrest. She and the Defendant visited often, and he spent the night at her apartment a few times. On June 16, 2011, she visited her friend, T.J., in Milan, and the Defendant asked to join her. The Defendant asked to be dropped off at the four-way stop just inside the Milan city limits. She dropped off the Defendant and met her friend. Before she and the Defendant drove to Milan, the Defendant had money and helped pay for gas. She took him to Walmart earlier that week to pick up at least $50 from his father. The Defendant arrived at T.J.'s house sometime after lunch and asked if she was ready to leave, and they left. The Defendant was not wearing a shirt when he arrived. As they got in her car, the Defendant asked to stop by a friend's house, and she took him there. The Defendant talked to his friend, and they left between 2:00 and 3:30 p.m. and returned to her apartment. The Defendant offered to pay for gas on the way home. The Defendant took a shower when they arrived at her apartment and watched television but left to talk to his cousin. The Defendant returned and asked her to drive him to the Walmart in Milan because of a family emergency. She drove the Defendant there and noticed he had a bag of clothes, money, and a cell phone. The Defendant told her, "Today, I hurt someone." She thought the Defendant was in a fight, but the Defendant said, "I killed someone."

Ms. Gadlen thought the Defendant acted "weird" when they returned to her apartment because he paced and talked to various people on the phone. She did not recall the Defendant's complaining of a headache or seeing a busted lip. She only saw a little, thin cut

on his finger. She said the Defendant lied about his name and his age. Although she denied that the Defendant had a "larger" amount of money after they returned from Milan, she said the Defendant's "roll" of money looked "fairly larger."

Jason McCain had known the Defendant for about five years. On June 16, 2011, he saw the Defendant at Mr. McCain's mother's house in Milan, which was a two minute drive from the victim's shop. He called the Defendant that day, who came to see him immediately. They talked, and the Defendant admitted stabbing and killing someone and taking money from the person he killed.

William Jerrell had known the Defendant for about seven years and had served time in jail with the Defendant. When they were both in police custody, the Defendant told him that he planned to go "in there" and take money but that things did not go as planned. It was supposed to be "a run of the mill robbery." The Defendant heard the victim had money, did not expect the victim to fight back, and stabbed the victim when he fought back. The Defendant took up to $4000 from the victim and bragged about "getting" thousands of dollars. The Defendant threatened to "do [Mr. Jerrell] just like he did that old man" if he testified. The Defendant referred to the victim as the old man.

Justin Adams also spent time in the local jail with the Defendant. The Defendant admitted killing the victim "[b]ecause he wouldn't sell me no tires" and taking $4000. The Defendant said the victim fought back with a hammer when the victim was about to stab him. The Defendant assaulted Mr. Adams and threatened that he knew "gang people" who could "get" to Mr. Adams's family.

Gibson County Correctional Officer Joel Hughey was involved in an altercation with the Defendant after attempting to remove contraband from his cell. The Defendant stated, "Well, you know what happened to Charlie. It will happen to you, too." A second altercation occurred during the Defendant's pretrial confinement regarding a lighter the Defendant had inside his cell. Sergeant Bobby Rogers and Officer Chad Droke searched the Defendant's cell after they smelled something burning. The officers attempted to perform a strip search, but the Petitioner refused and said, "Y'all are just picking on me because I killed your friend, Charlie Reagan." The Defendant threatened to kill Officers Hughey and Droke.

TBI Special Agent Jennifer Milsaps, an expert in serology and DNA analysis, analyzed the evidence. She concluded that the victim's blood and DNA were on the hammer and that partial DNA profiles matching the Defendant were on four places on the handle of the hammer. She concluded that a partial DNA profile matching the victim's was on the socket. Regarding the Defendant's clothes recovered at the time of his arrest, she concluded

that the victim's blood and DNA were on the front, lower right portion of the blue t-shirt and that the victim's DNA was on the Defendant's jeans. Although blood was present on the knife blade and handle, she was unable to detect the presence of DNA.

Miguel Laboy, an expert in the field of forensic pathology, performed the victim's autopsy and concluded that the cause of death was sharp force injuries to the chest. He found four stab wounds and one superficial incision. One stab wound extended into the chest cavity, injured three ribs, and perforated the lower right lung. Another stab wound perforated the left chest wall and penetrated the left chest. A third stab wound penetrated the soft tissue of the abdominal wall. He concluded that the victim died within minutes to hours of receiving the injuries and that it was possible the victim was able to fight his attacker before collapsing. The victim had defensive wounds on his left cheek, right arm, right elbow, right forearm, right wrist, right hand, left elbow, left hand, left middle knuckle, and left ring finger.

Upon this evidence, the jury convicted the Defendant of second degree murder and theft. The trial court sentenced the Defendant as a Range I, standard offender to consecutive terms of twenty-five years for second degree murder and eleven months, twenty-nine days for theft. This appeal followed.

The Defendant contends that the trial court erred during sentencing. He argues that the court misapplied mitigating and enhancement factors and that the court erroneously ordered consecutive sentences. The State responds that the court properly sentenced the Defendant. We conclude that the lengths of the sentences are proper but that the trial court erred by failing to state on the record the facts and conclusions which support consecutive sentences pursuant to *Wilkerson*, 905 S.W.2d 933 at 938. We remand the case in order of the court to make its findings and conclusions on the record.

The record shows that the Defendant was seventeen years old at the time of the offenses and that the Gibson County Juvenile Court ordered that the Defendant's case be transferred to the Gibson County Circuit Court. The transfer was based on the aggravated nature of the offenses and the juvenile court's finding that treatment and rehabilitation through the juvenile court was not possible.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed a pending vandalism charged in Gibson County. Although no convictions were reported, the Defendant admitted having a juvenile record in Denton, Texas for possessing and inhaling Freon and providing false police reports. The Defendant reported serving a six-month sentence on probation.

-6-

The Defendant reported completing the tenth grade, and his stated reason for leaving was that he was being transferred. Disciplinary records from John H. Guyton High School showed that the Defendant threatened to blow up the world during a classroom discussion, possessed marijuana on school property, and used vulgar language. The Defendant reported no disabilities or physical health problems. The psychological examination conducted to determine whether the Defendant was competent to stand trial showed that the Defendant suffered from post traumatic stress syndrome and borderline personality disorder. The Defendant reported using marijuana daily from age nine to seventeen and claimed his incarceration required him to stop the drug use. He also admitted inhaling Freon and using alcohol occasionally, beginning at age seventeen. During the presentence report interview, the Defendant reported no childhood abuse but claimed during the competency evaluation that his father and stepmother physically abused him.

The Defendant provided the following statement during his presentence report interview:

> I went to the muffler shop in Milan to get a job and while I was there the mechanic - Charlie Reagans [sic] - told me to wait and he will talk to me in a little bit. So I waited and when he was done I asked him if I can get a job working for him. He said no he doesn't want any n----- working for him. Well I said I'm not a n----- I'm just Black, and he said that what makes you a n----- [.] I said you racist b------. By the time I look at him there is a hammer coming straight at my face so he hit me, then I circle him and pick up a knife that was on the counter and he come again at me and I put the knife in him[.] He came at me 3 more times and each time he comes at me he got stabbed[.] Then he fell to his [knees] and I ran.

Several victim impact statements were attached to the presentence report. The victim's wife discussed her unhappiness without the victim and how her children were without their father. She expressed her dissatisfaction with the second degree murder verdict. She stated that she became depressed after the killing and that she took medication to prevent her from crying continuously. She wanted the Defendant to receive the maximum sentence.

Sheila Bell, the victim's sister-in-law, stated that she and the victim's wife were allowed to see the victim in the hospital after he died. She described the condition of the victim's body, the amount of blood, and the victim's children saying goodbye. She discussed the impact of the victim's death on their family and commented that the victim would never see his three daughters marry, his grandchildren grow up, or grow old with his wife. She claimed about 2000 people came to the funeral home when the victim died. She asked the

judge to sentence the Defendant severely to "make up" for the jury's failure to convict the Defendant of felony murder.

Ruth Reagan, the victim's mother, condemned the court system for the verdict and discussed her medical problems since the victim's death. She said that the victim's death almost killed her and that she took six medications "just to keep going." She said the victim had never been happier at the time of his death.

David Reagan, the victim's brother, discussed the family's reaction to the victim's killing and stated that they lived in constant fear. He discussed his dissatisfaction with the trial court's ruling to exclude photograph evidence of the victim holding money immediately after the killing and with the jury's verdict. He requested the Defendant receive the maximum sentence.

Larry Reagan, the victim's brother, testified that he had been a pastor for thirty-two years and that he and his family turned to their religion to deal with the loss of the victim. He said that God helped him find the ability to move on with his life but that he missed the victim greatly. He discussed the victim's love for football and said the victim was the unofficial chaplain of the Milan Bulldog Football team, maintained the flag at the football field, encouraged and counseled the players, and provided money to the team. He could not describe the impact of the victim's death on his mother but said they were together when he received the telephone call about the victim's being stabbed. He disagreed with the jury's verdict and believed the killing was intentional and premeditated.

Mr. Reagan testified that he did not hate the Defendant but wanted the trial court to give him the maximum sentence. He said he and his family wanted to see the Defendant repent and turn to Christ. He said he would have liked to have heard the Defendant's version of events at the trial. He noted that all the victim's family saw during the trial was the Defendant's "hard, cold stares" and a lack of remorse.

Lora Mosely, the victim's sister, read a previously prepared statement. She asked the court to consider the brutality of the victim's murder and to sentence the Defendant to twenty-five years. She said the victim was "a blessing to his church, to his community, and to his family." She discussed the victim's wife and children and said the victim's youngest child was twelve years old.

Defense counsel read the Defendant's previously prepared statement, which stated,

There's not enough words to heal the hearts of the family that I've hurt because of a very bad decision. I can only pray that y'all can forgive me, even

though I know you will never forgive me for this. I'm sorry for taking away a great man, husband, father, and friend to so many and if I could go back and change things I would. Please accept my apology for what I did.

The trial court considered the evidence at the trial and sentencing hearing, the principles of sentencing, arguments of counsel, the nature and characteristics of the offense, and evidence regarding enhancement and mitigating factors. Regarding mitigation, the court refused to find that mitigating factor (2) applied, stating that no "legitimate provocation" existed. *See* T.C.A. § 40-35-113(2) (2010) ("The defendant acted under strong provocation."). The court found that factor (6) applied because the Defendant was seventeen years old at the time of the killing. *See id.* § 40-35-113(6) ("The defendant, because of youth or old age, lacked substantial judgment in committing the offense."). Regarding factor (10), the court found that any assistance the Defendant provided to the police in recovering evidence was "insignificant." The court refused to find that factor (11) applied, stating that "this type of crime, even though we're seeing so much more of it than we used to, is still highly unusual as a criminal offense, but the Defendant's conduct was not unusual at all in terms of the way people commit these offenses who do that[.]" *See id.* § 40-35-113(11) ("The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated by criminal conduct.").

The trial court found that statutory enhancement factors (1), (5), (9), and (10) applied. *See* T.C.A. § 40-35-114 (2010). The court found that factor (1) applied because the Defendant had previous convictions and that his criminal history was relevant to this case. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). The court found that enhancement factor (5) applied and stated that the victim suffered a vicious attack executed with exceptional cruelty by the repeated stab wounds. *See id.* § 40-35-114(5) ("The defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense."). The court found that enhancement factor (9) applied because the Defendant used a knife during the killing. *See id.* § 40-35-114(9) ("The defendant possessed or employed a firearm, explosive devise or other deadly weapon during the commission of the offense."). The court found that factor (10) applied because the proof showed that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See id.* § 40-35-114(10).

The trial court found that the enhancement factors "substantially" outweighed the mitigating factors and that twenty-five years for the murder conviction and eleven months, twenty-nine days for the theft conviction were appropriate. In ordering consecutive sentences, the court found that the Defendant was a dangerous offender whose actions

indicated little or no regard for human life. The court found that the Defendant had no hesitation in committing a crime in which the risk to human life was high.

The Tennessee Supreme Court adopted the current standard of review for sentencing in *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). The length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708. In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d 68 at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

The Defendant claims that the trial court erroneously failed to apply mitigating factors (2), (6), (10), (11), and (13). *See* T.C.A. § 40-35-113. Although the Defendant contends in the issues presented for review section of his brief that the trial court failed to apply factor (6), the record shows that the trial court applied this factor. Likewise, the Defendant states in the argument section of his brief that the court "accepted mitigation factor 6." *See id.* § 40-35-113(6). Regarding factor (2), he states that although he disagrees with the court's failure to apply this factor, he understands the court's decision. *See id.* § 40-35-113(2). The record is absent evidence that the Defendant acted under provocation. Although the Defendant told the police that the victim attacked him with a hammer, no evidence was presented showing the Defendant had wounds, defensive or otherwise, or that the victim was the first aggressor. To the contrary, the medical examiner testified regarding the victim's defensive wounds to the upper extremities, indicating the Defendant was the aggressor. The trial court did not abuse its discretion by refusing to apply this factor.

Regarding mitigating factor (10), the Defendant claims the factor applied. *See id.* 40-35-113(10) ("The defendant assisted the authorities in locating or recovering any property . . . involved in the crime."). The record shows that the trial court considered this mitigating factor and found that the help the Defendant provided in locating the knife was "insignificant." The evidence shows that the Defendant picked up the victim's knife, used it against the victim, fled the scene with the knife, and discarded it. During his police interview, he provided the location of the knife. We conclude that the trial court considered and applied factor (10) but afforded it little weight in determining the Defendant's sentence.

Regarding mitigating factor (11), the Defendant claims he did not have a sustained intent to violate the law. *See id.* § 40-35-113(11). The evidence shows that the Defendant went to the victim's shop intending to steal money from the victim and that he stabbed the victim in the chest four times while the victim struggled to defend himself. The Defendant's then-girlfriend had plans in Milan the day of the killing, and the Defendant asked to join her. After they reached Milan city limits, the Defendant asked to be dropped off at the four-way stop and went to the victim's shop. The Defendant waited at the victim's shop for Mr. Pickler and the victim's customers to leave before robbing the victim. We conclude that the evidence does not preponderate against the court's finding that this factor did not apply.

Regarding the enhancement factors, the Defendant claims that the trial court erroneously applied enchantment factor (1). *See* T.C.A. § 40-35-114(1). He argues that his criminal history was insignificant and should not have been used to enhance his sentence. The presentence report showed that the Defendant admitted having a juvenile record in Texas for possessing and inhaling Freon and providing false reports. The Defendant reported using marijuana daily from age nine to seventeen and claimed his incarceration required him to stop the drug use. He also admitted inhaling Freon and using alcohol occasionally, beginning at age seventeen. Our supreme court has concluded that juvenile records may be considered when determining a defendant's previous criminal behavior. *See State v. Adams*, 864 S.W.2d 31, 34 (Tenn. 1993). The court stated that

> "[i]t would serve neither the interest of society, nor protect the public from further criminal conduct by the defendant, to wipe the slate clean and deny the sentencing authority the benefit of a defendant's past history of criminal activity, in assessing his sentence, simply because some part of that history occurred during his juvenile years."

*Id.* at 34 (quoting *State v. Stockton*, 733 S.W.2d 111, 112-13 (Tenn. Crim. App. 1986)). We conclude that the Defendant's juvenile conduct supports the trial court's applying enhancement factor (1).

-11-

The Defendant claims that the trial court erroneously applied enhancement factor (5) regarding the Defendant's treating the victim with exceptional cruelty during the commission of the offense. *See* T.C.A. § 40-35-114(5). The proof at the trial showed that the victim suffered four stab wounds to the chest and that one of those wounds was four and one-half inches deep and perforated the victim's lung. The medical examiner testified about the extensive defensive wounds found on the victim's arms and wrists. We cannot conclude that the trial court abused its discretion by applying this factor.

The Defendant states in the issues presented for review section of his brief that the trial court erroneously applied enhancement factor (9) regarding the use of a deadly weapon but fails to address it in the argument section of the brief. *See id.* § 40-35-114(9). In any event, the record shows that the Defendant used the victim's knife during the killing.

The Defendant claims that enhancement factor (10) is inapplicable because the Defendant was convicted of second degree murder. The State concedes that the trial court erred by applying this factor. We agree and conclude that the trial court should not have applied this factor. *See State v. Butler*, 900 S.W.2d 305, 314 (Tenn. Crim. App. 1994) (stating that enhancement factor (10) "should not be considered when an accused has been convicted of murder in the second degree").

Although we conclude that the trial court erred by applying enhancement factor (10), we cannot conclude that the court abused its discretion in imposing the sentences. The record reflects that the court considered the purposes and principles of the Sentencing Act and the appropriate evidence at the trial and sentencing hearing. The court properly applied the remaining enhancement and mitigating factors and found that the enhancement factors substantially outweighed the mitigating evidence. The misapplication of a single enhancement factor does not invalidate the Defendant's sentences. *See Bise*, 380 S.W.3d at 706. The Defendant is not entitled to relief on this basis.

Regarding consecutive sentences, our supreme court recently concluded that the appropriate standard of review for all sentencing decisions, including the determination to impose consecutive sentences, is an abuse of discretion with a presumption of reasonableness. *State v. James Allen Pollard*, — S.W.3d —, —, No. M2011-00332-SC-CD, slip op. at 9, 14 (Tenn. Dec. 20, 2013). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b)(4) (2010), which states, in pertinent part, that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."

Our supreme court has concluded that when the imposition of consecutive sentences is based on the trial court's finding the defendant to be a dangerous offender, the court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939; *see State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). Our supreme court has concluded that the abuse of discretion with a presumption of reasonableness standard does not eliminate a trial court's obligation to comply with *Wilkerson*. *James Allen Pollard*, — S.W.3d —, —, slip op. at 13. When a trial court fails to comply with *Wilkerson*, the appellate courts may conduct a de novo review of the record to "determine whether there is an adequate basis for imposing consecutive sentences" or "remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentencing." *Id.*, — S.W.3d —, —, slip op. at 14 (citing *Bise*, 380 S.W.3d at 705 & n.41).

We conclude that the trial court failed to make the appropriate findings pursuant to *Wilkerson*. The record shows that the court found that the Defendant was a dangerous offender whose actions indicated little or no regard for human life and that the Defendant had no hesitation in committing a crime in which the risk to human life was high. The court, though, failed to find that consecutive sentences were "necessary to protect the public against further criminal conduct by the defendant" and "reasonably relate[d] to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. Although the court discussed the nature of the killing and found that the attack was executed with exceptional cruelty and without hesitation, the court failed to discuss the need to protect the public and how consecutive sentences reasonably relate to the severity of the offenses.

In *James Allen Pollard*, the trial court made similar findings regarding consecutive sentences, and this court concluded that the court failed to comply with *Wilkerson* and that a new sentencing hearing was warranted in order to allow the court the opportunity to state on the record the facts which support consecutive sentences under *Wilkerson*. *See State v. James Allen Pollard*, No. M2011-00332-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App. Sept. 17, 2012), *perm. app. granted* (Tenn. Feb. 18, 2012). Our supreme court upheld this court's remanding for a new sentencing hearing "because the considerations required under *Wilkerson* involve a fact-intensive inquiry" and concluded that "the better course is to remand to the trial court for consideration of the *Wilkerson* requirements in determining the propriety of consecutive sentencing." *James Allen Pollard*, — S.W.3d —, —, slip op. at 14. In light of our supreme court's conclusions in *James Allen Pollard*, we conclude that the trial court erred by failing to state on the record the facts and conclusions which support consecutive sentences pursuant to *Wilkerson*, and we remand the case in order of the court to make its findings and conclusions on the record. *See id.*

In consideration of the foregoing and the record as a whole, we conclude that the lengths of the sentences are proper but that the trial court erred by failing to state on the record the facts and conclusions which support consecutive sentences pursuant to *Wilkerson*. We remand the case in order of the court to make its findings and conclusions on the record.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE